https://www.carecloud.com https://www.carecloud.com 1622 Athenahealth, Inc. v. CareCloud Corporation Can I ask a question though about technological invention? I mean, are we just collapsing technological invention and the 101 Alice standard into one essentially? Or are they separate inquiries? I think they're separate inquiries, Your Honor. The technological invention inquiry for the jurisdiction is a two-part inquiry under the under the rules. The first part is it novel and non-obvious, and the second part is it a technological solution to a technological problem. Is it collapsing the second part then with the initiation standard? I think the second part is overlaps. The second part of the technological invention standard of the jurisdictional question overlaps with part of the inquiry for Alice Step 2. It's the same? For the part of the inquiry for Alice Step 2 where you're looking at is there a technological solution to a technological problem? I think they're very similar. They may be the same. I don't think this court has said that, but they use the same language. How could it be that you get into proceedings, a CBM proceeding involving 101, and at the end of the day you decide that it is 101 eligible, and that means it shouldn't have been initiated in the first place, and therefore there's no estoppel effect to the final decision. I mean that really can't have been what Congress intended, could it? I think that's a fair question, Your Honor, that the rule does say what the rule says. I do understand that concern that the jurisdictional part of the regulation serves as a gatekeeping function for allowing the CBM to go forward, but it is, I mean, the regulation says what the regulation says and What does it say? It's a two-part analysis. I mean as we said in Versada, it doesn't say much, unfortunately. As you said in Versada, it doesn't say much, but Versada can't change what the regulation says. I mean the regulation says 42.301B it's a technological invention if the claim subject matter as a whole recites a technological feature that is novel and non-obvious, part one, and solves a technical problem using a technical solution, part two. In CiteSound, we said that that's reviewed under an arbitrary and capricious standard. I mean, why can't why can't we say, well, the initial determination is to be sustained if it's a reasonable determination on the record that existed at that time, but the later on there's more evidence received and the final decision may be different from the initial decision, but that doesn't mean that the initial decision was wrong or that the proceeding was improperly initiated. I think as a general matter, you could say that, but what the board did here in the initial stage, it didn't apply the as-a-whole requirement of 37 CFR 42. It looked at the specific components of the claim and it looked at the conventionality of the claim. You're demanding a level of precision at the outset, which it seems to me is very difficult to achieve and creates this situation where you're conflating the initiation decision with the final decision, which you've agreed would be impractical. I think it is impractical to say that the initiation decision has to be of the same level, same scope as the final decision. At the same time, the regulation does say what the regulation says and following the language of the regulation, applying the claim subject matter as a whole and looking at whether or not it's solving a technical problem, a technical solution to a technical problem. I don't think the board did that. It even came close to doing that in the initiation stage here. Okay, I understand the point. It is a concern. I understand the concern that was raised in Versada. It is a gatekeeping statute. I don't disagree that the board can build the record and come to a determination at the end that may differ from that. So why don't you turn to 101? Sure. So following up from that, this case does present a unique set of facts and it is a what the claims cover here is a technical, a specific technical solution to a specific technical problem in the insurance industry. It's the interaction, the integration between a doctor's office submission, claim submission system and an insurance company back-end pay or verification system. And I think that's the crux of the issue here. The board didn't give full weight and full consideration to the to the crux of the invention here. And on the same record, the board found that the claims were novel and not obvious. And on the same record, it was undisputed that there were other ways of doing this, that there were other ways of implementing the idea that, and so preemption was not a concern here. And so the the board I think fell into the trap that this court has cautioned about in recent cases such as McRow and Bascom and Enfish that you can't, when you're characterizing or attempting to characterize the abstract idea, you can't over generalize, you can't over abstract, and you can't deconstruct it into these individual components and look at the conventionality of each individual component. I think the Supreme Court has said, and this court has said, you can always boil down any idea into some level of abstraction. And that's the struggle with all of these cases. But how is this that different from from the actual, the actual program that was at issue in Alice? So this, the what's going on here is it's, it was, it was new, it was novel, it was something that hadn't been done before. And if I can step up and step back and explain what was going on in the industry. At a high level. At a high level, sure. Pre-computerization and then post-computerization. The, before the computer age, it was expensive for the insurance companies to review all the claims. And so there was no computers. So they, essentially, and this is... So computers enabled them to review the claims more efficiently. So, once things became computerized, the, the insurance companies implemented these rules. And this is what created the problem. The computers, the insurance companies implemented rules by which they would reject claims. There was no integration between the doctor's office, the medical practice management servers, and the insurance company. So what happened was all these insurance claims were coming in and they were getting rejected. And they weren't getting paid. And there was no integration between the systems. And that's at the heart of the invention of the world. But surely it was practical. And it was done that these claims were checked against a set of rules. For typos, for example, that would be a rule, right? There were... Would typos be a rule? Typos... There was error checking. What would typos be a rule? Would typos be a rule? Checking for a typo could be a rule. Right. Okay. So that was done before, right? It was... It was not done in the sense of a pre-claim submission. There were typos that were checked at the NPM level. There were... There were error... There were things that were done. There was error checking. There was error... There was a verification process that was done at the initial stage. There were typos... Even pre-computer... Even pre-computer, didn't the insurance companies notify the providers or their service companies that we won't accept a claim unless it provides this information? And that's our rule. So there were different ways of understanding what the insurance companies would do. And that's actually one of the inventive aspects of the claim. Through the experience of the medical practice management or through the experience of the doctor's office, people understood what was going to get rejected and what wouldn't get rejected. But what wasn't done was taking the real-time updated rules from the insurance company and integrating it with the doctor's office so that you would... At the doctor's office, using an innovative... But the doctor's office, before computers knew that the form had to be completed and they were checking to see that the form was completed, right? The... The doctor's office was doing eligibility checks. And that's describing the patent. The doctor's office... What the doctor's office wasn't doing was checking to see if the insurance company's up to snuff. Completeness? They weren't checking for completeness? There was... There was some... I don't think there's anything in the record that's saying that either rules were being applied from the insurance company or that rules were being applied in an updated fashion or that it was being integrated in real time. Where in the patent does... Is there a specification of what exactly the rules are that were being implemented or guarded against? So the patent describes... The patent describes the the rules database and the rules and how they're implemented at column six. But it doesn't define what those rules are, right? In column six, it does describe how the rules will be applied. There are other portions of the specification that that talk about how the workflow processing engine and the rules engine will will apply those rules. But the rules are described both in column six and in the claim itself as to as to the novel aspects that were needed to integrate these systems. I mean, this is not the case... The rules are not novel, right? A rule could be novel. But a rule, a completeness rule, is a rule within the meaning of the claims, right? A completeness rule could be a rule within the meaning of the claims, yes. Are you familiar with the decision that we issued yesterday, Intellectual Ventures versus Capital One? Yes. Where we said an unspecified set of rules isn't enough for purposes of step two of ALICE? And I think in that case, this is the indexing, the XML indexing case. The concern there was, if I recall, I just read this last night, the concern in that case was the the abstract idea of indexing, searching on a database, and then trying to narrow the application of that to the field of use using XML tags. My understanding is XML and tagging were synonymous, so it was essentially a limitation on the field of use, which doesn't allow you to pass step two. What we have here is very different. I mean, what we have here is much more akin to the case in Bascom and Amdocs, where you have distribution of elements that are put together in a novel way using conventional elements. So, you know, the question in Bascom was the abstract idea, internet filtering, that it was conventional elements, conventional network elements, conventional computer elements that were arranged in a way that hadn't been done before. What we have here, yes, there are conventional computer elements. Yes, there are rules. We don't disagree that, in general, a rule could be conventional or a database could be conventional. But what you have here, and I think that the key here, is that the implementation of the rules in the database and the interactive interface, which was novel, by the way, and hadn't been put together in a way that had been done here, integrated the two systems in a way that hadn't been done before. Nobody before this invention at the doctor's office was able to see the rules in real time from the insurance company and then interact with the errors and fix it in advance. There was some error checking at the MPM stage. There was some error checking with some fraud questions at the insurance office. But wouldn't people at the doctor's office have the set of insurance company rules, and when they're submitting a form, they would have to make sure that they satisfied those rules, right? This is just doing that faster. I don't think there is any evidence that anyone, in fact, I think, I don't think there's evidence that anyone at the doctor's office was applying rules from the insurance company. I think what was being done at the doctor's office was verification checks. They were told to complete the form. That's a rule. You admit that's a rule and they were checking to see that they completed the form, right? Your Honor, that's different than knowing in advance, are you going to pass all of the rules and classes? Are you filling out the form? Are you going to meet all the requirements for each particular plan? Are you getting the most up-to-date rule? And that hadn't been done before. Is it your point that the rules could change on a daily basis and that this is a system that allowed you to have those Yes, I mean that was one of the key rules. That was one of the key aspects that distinguished this over the prior art was the ability to update the rules in real time directly from the payor server. That was one of the key limitations here. From the payor server, that hadn't been done before. The PTAB here below said that that wasn't, that hadn't been done before and that hadn't been integrated and if I can, for a moment, I know I'm beyond my time. Yeah, well, I think we'll give you two minutes for rebuttal. We're out of time right now. Now you're going to have to sit down. We'll give you two minutes for rebuttal. Mr. Farris. Thank you, Your Honor. May it please the court, my name is Ozzie Farris and I represent CareCloud in this matter. Your Honor, in the underlying CBM proceeding on the strength of the available record, the PTAB got it right that the claims are directed to the general abstract idea of scrubbing claims before submission and that the claims recite mere conventional and routine computer components to carry out that abstract idea. The PTAB's finding is entirely consistent, Your Honors, with what the inventors tell us in the patent. For decades, and these are words straight out of the patent, not mine, for decades medical practitioners would interact with insurance companies to determine whether there was a problem with medical claim submission, and this happens before... What about this last limitation, though? I think that this is one that is somewhat different from just putting something on a computer. The ability to have updated rules from the payor that you can Doesn't that materially change the nature of the invention? That's not the invention, Your Honor. The claims don't talk about... There's a generic reference to integration of disparate and distinct systems, but the claims don't recite any integration whatsoever. In fact, we don't even know based on the claim language whether these components are even in communication. These are all method claims. We speak about servers, we speak about databases, we speak about client stations, but there's no communication means or mechanism or structure by which these components talk, and they reference the specification, and they're trying to backfill the claim by getting limitations about these so-called updates or taking place in real time. The only thing the claims speak to is that they're received from a payor server, but there's no explanation as to how that happens, and we know from Your Honors' ruling in Accenture that you cannot... The claim invention is what needs to be assessed. You cannot look at the more detailed specification to take an otherwise abstract idea and make it patent eligible. What about the notion that it's... that the board found this to be non-obvious and not anticipated? Well, I think that's an excellent question, Your Honor, and it's one that has been addressed before. There are two issues that I think they categorically try to leverage and really just collapse the 101 issue down to really two questions, right? Novelty slash non-obviousness and preemption. Neither one of those is dispositive on the 101 issue. It's a separate substantive determination that needs to be made on its own facts, and the Supreme Court in Mayo said very clear. A novel and non-obvious claim directed to a purely abstract idea, which is exactly what we have here, is nonsense, Your Honor, because, first of all, you'd eviscerate the whole 101 requirement altogether if you simply said it's based on whether it's novel or non-obvious. But secondly, even if you... That would be a good idea. But it would also be absurd in the sense that, so on the strength of, for example, these references that we proposed to the CBM and the PTAB, it would seem to make the 101 determination a temporary one or an ad hoc one in the sense that... So it's patent eligible because it's not obvious over these references, but what happens if later on some additional better references, let's say, turn up? Does it all of a sudden turn the abstract idea into being a patent eligible subject matter? It doesn't make much sense. There are two separate determinations. The 101 determination is the front door into the Patent Office. If you can't get past that, separate and apart from 102 and 103, then the fact that, on the record evidence of a certain combination of references, the subject matter may be not obvious has no bearing whatsoever on the 101 determination. And then secondly, the preemption concept is similarly being misapplied by appellants. The Ariosa case and, more recently, the McGrow decision made it very clear that where a patent's claims are deemed only to disclose ineligible subject matter, and that's exactly what the PTAB found here, Your Honor, as they are in this case, preemption concerns are fully addressed and made moot. And that makes a lot of sense, Your Honor, because the focus of 101 is, what is the invention? The invention here is doing nothing more than detecting and correcting errors in a medical claim submission before you send it off to the insurance company for payment. Does it correct them, or does it pop up a screen that says you need to correct? Well, I think, Your Honors, I've offered up a situation where if there's a typo, I think it's rather common sense to correct that typo before you submit the payment, especially if you know, and this is on both sides of the parties here, the expert testimony is that everyone wants to get paid quickly. So, for no other reason, you're going to detect that typo and you're going to correct that typo before you send that bill off to the insurance company, because it's going to delay payment if it's not fixed. And so, the prior art and the evidence of record, both from the teachings of the patent itself, from the expert testimony of record. In fact, Your Honors, I think there was a comment made that there is no evidence in the record that in the way this was done before, it was done with medical practitioners. That's entirely incorrect. Their own expert, Mr. Gooden, specifically testified and actually recalled a binder of rules that used to be used to process these claims before submission and to use to detect and correct error. And so, the reality is, and I think there was some reference made to clear jurisprudence on this issue, that the mere enhancing or speeding up or making more efficient of an abstract idea on a computer does not take the otherwise ineligible subject matter and make it pass muster under 101. That's basic Alice. That's basic Alice, Your Honor, and it goes all the way back. You mentioned intellectual ventures. There was a decision from a few years ago where that was exactly the point. It chronicled the list of cases that made that point very clear. And that's exactly what's going on here. You're essentially, if you look at the distinct components in these claims, you have a medical practice management server, you have a client station, you have a database, you have a payer server. The PTAB correctly determined that these are all standard generic routine conventional components, and that's straight out of the specification. I think the server is defined as being any computer. You can't get more general than that. What is your response to the issue of the interplay between technological invention and the 101 inquiry? I mean, your brief, even more so than the other side, completely collapses the analysis. Yeah. Yeah, I think the issue, I mean, you have to look at it. I'm glad you admit that. Yeah. I tried to be very precise in making my point. The reality is the rules say what they say, but so do the opinions of this court. And this court made it very clear that it is a technical invention, the PTAB under that authority isolated the technical aspects of the claims and said they're routine, conventional, well-known. Versada also made it clear that it's premature to assess the patentability of the method steps. And that's common sense. At the end of the day, it's a jurisdictional determination that's being made, not a substantive one. And so I would say that for purposes of the jurisdiction... But the inquiries can't be, the standards can't be the same for initiation and the final result because if the claims were determined to be patent eligible, then that would not create an estoppel. That can't be what was intended. There has to be a different standard for initiation and for invalidation at the end, right? I think so, although I suspect that the scope of the record would evolve throughout the proceeding and there may be some more light shed on the issue. But at the end of the day... But it's also the different standards. I mean, it's a question of it doesn't have to be preponderance at the initiation stage. Arbitrary and capricious at the jurisdictional level versus preponderance at the substantive merit level. But certainly as applied here, the PTAB did what it had to do. It identified and called out the technical aspects and determined that there was no technical solution being offered here. These are routine conventional components. We don't, if we agree with you on the 101 analysis, we don't need to reach your obviousness points, right? That's correct. I mean, we disagree with the obviousness determination, Your Honors, but at the end of the day all claims have been rejected. I mean, the obvious determination was in large measure predicated on your failures of proof, right? Well, I think the proof was there. I think it was misunderstood or misapprehended and in some cases outright ignored, frankly. I think our brief sets out the reasons why that's the case, but just two instances that I would like to point your attention to is the PTAB in the final written decision specified that there's two points that they made that the petitioner did not assert in its petition that, one, a person of skill in the art would have included Holloway's rules and Barber to correct or identified errors, or, two, that a person of skill in the art would have included Reeker's real-time determination for each payer and Barber to enhance Barber's error detection function with updated information. There's two specific points in our petition, our original petition, where we make that exact same point. So he calls in the question the extent to which the PTAB reviewed all of the evidence. And our position is, under KSR and the more recent case in Randall, that you can't take a very rigid approach to making the obviousness determination. It has to be... Well, you can't just list elements in the prior art. You've got to have some basis for combining those elements, right? We do have those basis, and the two examples that I just mentioned here are basis that we provided in the petition. And furthermore, there was also some... I think it was unfortunate, but the PTAB seemed to disregard Dr. Berger on supplemental declaration. And I would add only that that was our first opportunity to respond to appellant's response and preliminary response to the original petition. And one of the issues that came up is that they defined the term rules to be coded logic that evaluates and information that performs an action or something along those lines. And so we felt the need to submit a supplemental declaration where Dr. Bergeron applies that understanding as well, and at the end of the day concludes that there's still... the claims are still invalid over the proposed combination. And so our position is that the 103 determination, although mooted entirely, if the 101 goes our way, it's still... we believe that it was not properly decided and your honors should should take a look at it. Okay, anything further? I... that's all I have to say. Okay. Thank you. Mr. Corbett, you have two minutes for rebuttal. A couple of quick points. This is not just the enhancement and speeding up of some abstract idea, just the same way that in BASCOM it wasn't just the enhancement and speeding up of filtering on the internet in the way in AMDOX, it wasn't just the enhancing and speeding up of correlating records on a network. There... those were things that, yes, they sped things up and they did... they enhanced things, but they also did things differently. They... they did... it was a different arrangement of conventional components in both of those cases. We have an arrangement of components that integrates the insurance, the health insurance, the payor, rules updated with... with the doctor's office in a way that had not been done before in real time with rules from the payor. And this is important, using the claim edit screen, and I didn't get to talk about this as much in my opening, but the claim edit screen was one of the key novelty aspects, both in the initial prosecution and with the PTAB's decision for non-obviousness. It's a... it was an innovative interface that hadn't been used before in the context of the insurance industry that allowed the folks at the doctor's office to see, in the same screen, both the error and the... a way to correct it at the same time, and that hadn't been done before. There were... you know, this was one... I asked that question, and... and... so does it auto-correct or... or does... does it... does it sometimes auto-correct when there's a typo? It's... it's on the same... what... what the claim covers is, on the same screen, it gives you an indication of the error and the ability to correct it. But it doesn't auto-correct? I... I don't believe it auto-corrects. So that's point two, the... the claim edit screen. Point... point three is... is this integration. The integration... it's spelled out right there in the claims, and... and how you take the rules from the payor and... and interact with the doctor's office. And it does it in a way that... that leaves many other... many other unclaimed implementations that are not field-of-use things, but there are lots of different ways you can get rules from the insurance company. There are lots of different ways you could... you could use an interface that allows you to... to receive those rules and works with them, but this is a very specific implementation. Okay. All right. Thank you. I think we're out of time. Thank both counsel. The case is submitted, and that concludes our session for this morning.